Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE CHILDREN'S PLACE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 20-7980 (ES) (CLW)<br><br>OPINION |

**SALAS, DISTRICT JUDGE**

Plaintiff The Children's Place ("TCP" or "Plaintiff") initiated this action to recover on an insurance policy issued by defendant Zurich American Insurance Company ("Zurich" or "Defendant"). Presently before the Court are the parties' cross-motions for judgment on the pleadings. (D.E. Nos. 17 & 18). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, the Court GRANTS Defendant's motion and DENIES Plaintiff's motion.

I.   BACKGROUND AND PROCEDURAL HISTORY

This matter is one of many analogous cases filed after an insurance company denied coverage for claimed losses stemming from the COVID-19 pandemic. TCP is an internationally recognized retailer of children's specialty apparel. (D.E. No. 1 ("Complaint" or "Compl.") ¶ 8). TCP reportedly operates over 900 stores throughout the United States, Canada, and Puerto Rico and supplements its storefront locations with an online marketplace. (*Id.*). In the wake of the global COVID-19 pandemic in early 2020, many state and local governments enacted shelter in place directives ("Stay-at-Home Orders") to combat and slow the spread of SARS-CoV-2 (the

1

"Virus" that causes COVID-19). (*Id.* ¶¶ 16–24 & 56–58). The Stay-at-Home Orders "typically require[d] . . . non-essential" businesses to close in order to limit individuals' exposure to the Virus. (*Id.* ¶ 59; *see id.* ¶ 58). As a result of the Stay-at-Home Orders, TCP allegedly closed every storefront location it operates across the United States, Canada, and Puerto Rico. (*Id.* ¶ 65). At the time TCP filed the Complaint on June 30, 2020, many of its locations either remained closed or had partially reopened. (*Id.*). TCP maintains that COVID-19 and the Stay-at-Home Orders severely diminished its business. (*Id.* ¶ 66). Consequently, TCP submitted a claim for insurance coverage under an "all risks" policy it entered with Zurich (*see* D.E. No. 17-2 ("Policy" or "P.")). (Compl. ¶¶ 1 & 126–27).

The Policy (No. PPR1865134-01) took effect on March 1, 2020, and provided TCP coverage through March 2, 2021. (*Id.* ¶¶ 9 & 13; *see* P. at 14).[1] Because Zurich drafted the Policy to take effect *after* SARS-CoV-2 began to spread across the world, TCP avers that Zurich knew about the Virus prior to the Policy's inception. (Compl. ¶¶ 15–16 & 25). For example, TCP alleges that on January 30, 2020, the World Health Organization ("WHO") declared the Virus outbreak a "Public Health Emergency of International Concern." (*Id.* ¶ 22). In mid-February 2020, the United Nations, led by WHO, activated a Crisis Management Team "to develop and coordinate implementation of a worldwide plan in response to the outbreak." (*Id.* ¶ 24).

TCP's Policy broadly "[i]nsures against direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property, at an Insured Location . . . subject to the terms, conditions and exclusions stated in th[e] Policy." (P. at 15). A "**Covered Cause of Loss**"

---

[1] All pin citations to the Policy refer to pagination automatically generated by the CM/ECF system. The Court cites to the Policy attached to Zurich's moving brief (D.E. No. 17-2), rather than the one attached to the Complaint, because the latter covers a period from March 1, 2019, to March 1, 2020—a timeframe that is not in contention according to TCP's allegations. (*See* Compl. ¶ 13 (citing D.E. No. 1-1); D.E. No. 21 at 3 n.4). Nevertheless, even if "[t]he precise date that [TCP's] claim arose has not yet been determined" (D.E. No. 22 at 1 n.1), the provisions at issue under both policies are identical. (*Compare* D.E. No. 17-2, *with* D.E. No. 1-1).

2

encompasses "[a]ll risks of direct physical loss of or damage from any cause unless excluded." (P. at 66). "Covered Property" consists of "property . . . located at an Insured Location or within 1,000 feet thereof or as otherwise provided for in th[e] Policy." (P. at 24). Finally, an "Insured Location" is a location "[l]isted on a Schedule of Locations on file with Company; per most recent statement of values . . ." (P. at 15).

TCP alleges that on or about April 3, 2020, Zurich received its notice of loss detailing TCP's request for insurance coverage under the Policy. (Compl. ¶ 126). On June 11, 2020, Zurich denied TCP's claim (*id.* ¶ 127) because COVID-19 "does not constitute physical loss of or damage to property" (*id.* ¶ 128). Following Zurich's denial, TCP brought the instant lawsuit for breach of contract and declaratory judgment. (*Id.* ¶¶ 1 & 140–78).

Specifically, TCP maintains that "COVID-19 and Stay at Home Orders have severely diminished [its] business" (*id.* ¶ 66) such that it "suffered direct physical loss of and/or damage to its property" (*id.* ¶ 68). In addition, TCP argues that "COVID-19 physically affects the property on which it is present" (*id.* ¶ 58), and the resulting "limitation on operations is not sustainable" because TCP "relies on in-store experiences to drive a large portion of its sales" (*id.* ¶ 67). Accordingly, TCP avers that three distinct Policy sections cover its losses: (i) "Section III - Property Damage," (ii) "Section IV - Time Element," and (iii) "Section V - Special Coverages & Described Causes of Loss." (*See id.* ¶¶ 74–104). The specific provisions at issue include the following:

| Provision | Providing Coverage For . . .[2] |
|---|---|
| **Property Damage** | "Covered Property . . . located at an Insured Location or within 1,000 feet thereof or as otherwise provided for in this Policy." (P. at 24; *see* Compl. ¶ 74). |

---

[2]   Terms quoted in bold denote definitions in the Policy. (D.E. No. 21 at 5 n.11).

| | |
|---|---|
| **Time Element** | "loss . . . from the necessary **Suspension** of [TCP's] business activities at an Insured Location. The **Suspension** must be due to direct physical loss of or damage to Property . . . caused by a **Covered Cause of Loss** . . . ." (P. at 29; *see* Compl. ¶ 77).<br><br>**Suspension** is defined as "[t]he slowdown or cessation of [TCP's] business activities" or "[a]s respects rental income that a part or all of the Insured Location is rendered untenantable." (P. at 72). |
| **Extra Expense (Time Element)** | "the reasonable and necessary Extra Expenses incurred by [TCP], . . . to resume and continue as nearly as practicable [TCP's] normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage caused by a **Covered Cause of Loss** to Property . . . ." (P. at 31; *see* Compl. ¶ 82).<br><br>Extra Expense means the "amount spent to continue [TCP's] business activities over and above the expenses [TCP] would have normally incurred had there been no direct physical loss of or damage caused by a **Covered Cause of Loss** to Property . . . ." (P. at 31). |
| **Civil or Military Authority (Special Coverages)** | "Time Element loss . . . resulting from the necessary **Suspension** of [TCP's] business activities at an Insured Location if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**. That order must result from a civil authority's response to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by [TCP] . . . ." (P. at 36–37; *see* Compl. ¶¶ 90–91). |
| **Contingent Time Element (Special Coverages)** | "Time Element loss . . . directly resulting from the necessary **Suspension** of [TCP's] business activities at an Insured Location if the **Suspension** results from the direct physical loss of or damage caused by a **Covered Cause of Loss** to Property . . . at **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations**, and **Attraction Properties** located worldwide except for [various countries] . . . ." (P. at 37–38; *see* Compl. ¶¶ 94–100). |

4

| | |
|---|---|
| | "**Direct Dependent Time Element Location**" is defined as "[a]ny **Location** of a direct: customer, supplier, contract manufacturer or contract service provider to [TCP]; [a]ny **Location** of any company under a royalty, licensing fee or commission agreement with [TCP]." (P. at 67).<br><br>"**Indirect Dependent Time Element Location[s]**" include "[a]ny **Location** of a company that is a direct: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**; or [a]ny **Location** of a company that is an indirect: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**." (P. at 68).<br><br>Finally, "**Attraction Properties**" are any "property within the distance described in the declarations of an Insured Location that attracts customers to [TCP's] business." (P. at 65). |
| **Ingress/Egress Coverage (Special Coverages)** | "Time Element loss . . . resulting from the necessary **Suspension** of [TCP's] business activities at an Insured Location if ingress or egress to that Insured Location by [TCP's] suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a **Covered Cause of Loss** to property not owned, occupied, leased or rented by [TCP] . . . ." (P. at 41; *see* Compl. ¶ 101). |

The Policy also contains several exclusions. For example, under the Property Damage section, the Policy excludes coverage for "**Contamination**,[3] and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy" unless "it results from direct physical loss or damage not excluded by th[e] Policy" (the "Contamination Exclusion"). (P. at 25). TCP preemptively asserts that the Policy's Contamination Exclusion does not bar its claim for coverage. (Compl. ¶¶ 112–25).

---

3   "Contamination" includes "[a]ny condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew." (P. at 66).

5

On October 9, 2020, Zurich filed a motion for judgment on the pleadings (D.E. No. 17) and TCP cross-moved for partial judgment on the pleadings. (D.E. No. 18). Because TCP moves for partial judgment on the pleadings, it seeks limited relief in the form of a declaration stating that: (i) "the presence of COVID-19 and its disease causing virus, SARS-CoV-2, on property and in the air that eliminates the property's utility and habitability, constitutes 'direct physical loss of or damage to' [TCP's] property" under the Policy (D.E. No. 18-16 at ¶ 1); and (ii) the Policy's Contamination Exclusion "does not exclude coverage for losses arising from the direct physical loss of or damage to property caused by COVID-19" (*id.* ¶ 2). The motions are fully briefed and ripe for determination. (D.E. Nos. 17-1, 18-1, 21, 22, 23 & 24). The Court is also in receipt of Zurich's supplemental authorities. (D.E. Nos. 26-1, 26-2, 28 & 28-1).

## II.   LEGAL STANDARD

A party may move for judgment on the pleadings after the pleadings are closed. *See* Fed. R. Civ. P. 12(c). When adjudicating a motion for judgment on the pleading that seeks dismissal for failure to state a claim, the court applies the same standard as under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(h)(2); *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

To state a claim, a complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Neither a claimant's "blanket assertion[s]" of a right to relief, *Twombly*, 550 U.S. at 556 n.3, nor "threadbare

recitals of a cause of action's elements, supported by mere conclusory statements" satisfy Rule 8(a)(2)'s requirements. *Iqbal*, 556 U.S. at 663.

Rule 8(a)(2)'s pleading standard also requires that a complaint set forth the plaintiff's claims with enough specificity as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must contain "sufficient facts to put the proper defendants on notice so they can frame an answer" to the plaintiff's allegations. *Dist. Council 47, Am. Fed'n of State, Cty. & Mun. Emps., AFL–CIO by Cronin v. Bradley*, 795 F.2d 310, 315 (3d Cir. 1986).

In assessing a Rule 12(b)(6), or as here, a Rule 12(c), motion, "all allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference drawn therefrom." *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). But a reviewing court does not accept as true the complaint's legal conclusions. *See Iqbal*, 556 U.S. at 678. Therefore, a court must first separate a complaint's facts from its legal conclusions and then assess whether those facts raise a plausible claim for relief. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).

Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).[4]

## III.   DISCUSSION

As a preliminary matter, the parties do not contest that New Jersey law applies to the instant

---

[4] As the Court noted in its letter to counsel, to the extent TCP's statement of undisputed material facts (*see* D.E. No. 18-2) contains facts outside the pleading, the Court does not consider it; nor is the statement necessary if it reiterates allegations in the pleading. (D.E. No. 15). Accordingly, the Court only considers the Complaint, the Policy, and, to the extent necessary, any documents incorporated by reference therein.

contract dispute. (*See* D.E. No. 17-1 at 10–11; D.E. No. 18-1 at 6–7; D.E. No. 22 at 2). Under New Jersey law, determining "the proper coverage of an insurance contract is a question of law." *Buczek v. Cont'l Cas. Ins. Co.*, 378 F.3d 284, 288 (3d Cir. 2004). Because an insured party "bears the burden of bringing its claim within the basic terms of the insurance policy," TCP must establish that its claim for coverage unambiguously falls under the Policy. *See, e.g.*, *Arthur Anderson LLP v. Fed. Ins. Co.*, 3 A.3d 1279, 1287 (N.J. App. Div. 2010). "An insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled." *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010). Thus, if the terms of the policy are clear, the court will enforce the insurance policy according to its "plain and ordinary meaning." *Flomerfelt*, 997 A.2d at 996; *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008) ("If the language is clear, that is the end of the inquiry."). Absent ambiguity, "a court should not engage in a strained construction to support the imposition of liability." *Longobardi v. Chubb Ins. Co. of New Jersey*, 582 A.2d 1257, 1260 (N.J. 1990). Said another way, while "courts should construe insurance policies in favor of the insured, they 'should not write for the insured a better policy of insurance than the one purchased.'" *Id.* (quoting *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 214 (N.J. 1989)).

As explained in more detail below, the Policy provisions at issue are unambiguous, and the Court will enforce the Policy as written. Because both the declaratory judgment (Count I) and breach of contract claims (Counts II–IV) turn on whether TCP's alleged losses are covered under the Policy, the Court addresses all claims simultaneously. Ultimately, the Court concludes that TCP fails to establish its claim for insurance coverage under the Policy's basic terms—specifically, the Court rejects TCP's arguments that its insurance claim based on COVID-19 falls under the Policy's Property Damage, Time Element, or Special Coverages provisions in dispute.

### A. Property Damage and Time Element Provisions

In the Complaint, TCP alleges that the "presence of COVID-19" at its Insured Locations and within 1,000 feet thereof triggers the Property Damage and Time Element provisions because COVID-19 "has caused and continues to cause physical loss of and/or damage to property at those locations." (Compl. ¶ 74; *see id.* ¶¶ 77, 82, 87; *see also* P. at 15, 24, 29 & 31). TCP's argument, however, ultimately falls short. Although the Policy does not define "direct physical loss of or damage," this language is not ambiguous. For example, a leading insurance treatise explains that the term "physical" preceding "loss" necessarily requires tangible property loss:

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

10A Couch on Ins. § 148:46 (3d Ed. 2021). By contrast, "[p]ure economic losses such as loss of business, loss of goodwill, lost profits, loss of investments, and diminution in value are intangible and do not constitute property damage under a commercial general liability policy." *Id.* § 129:7.

Here, TCP claims that COVID-19 "physically affects the property on which it is present." (Compl. ¶ 58). Critically, however, TCP does not allege any tangible loss or physical damage to its stores across the United States, Canada, or Puerto Rico. (*See generally id.*). Notwithstanding TCP's assertion that COVID-19 forced "physical changes to its property" (D.E. No. 22 at 1), there are also no allegations concerning physical alterations or repairs to TCP's stores or to property "within 1,000 feet thereof" (P. at 24). (*See generally* Compl.). Similarly, while the COVID-19 pandemic understandably impacted TCP's business (*id.* ¶¶ 66–67), TCP's purported loss of use is untethered from physical property loss or damage. (*See id.*). Because TCP's alleged losses are not causally connected to the physical condition of its stores, TCP's claim for insurance coverage

9

falls outside the Policy's scope.[5] This conclusion is consistent with other courts in our Circuit and throughout the country that have interpreted insurance contracts in analogous COVID-19-related disputes, including other cases lodged against Zurich. *See, e.g.*, *Star Buick GMC v. Sentry Ins. Grp.*, No. 20-3023, 2021 WL 2134289, at *5 (E.D. Pa. May 26, 2021) (concluding that "the plain meaning of the phrase 'direct physical loss of' requires an explicit nexus between the purported loss and the physical condition of the insured property"); *Spottswood Companies, Inc. v. Zurich Am. Ins. Co.*, No. 20-10077, 2021 WL 2515255, at *5 (S.D. Fla. June 14, 2021) (finding plaintiff failed to demonstrate "that alleged losses arising from the COVID-19 pandemic satisfy the requirement of 'direct physical loss of or damage'" which "is included in every relevant provision of the [p]olicy" issued by Zurich); *First Watch Rests., Inc. v. Zurich Am. Ins. Co.*, No. 20-2374, 2021 WL 390945, at *4 (M.D. Fla. Feb. 4, 2021) ("[T]he [c]ourt agrees with Zurich that [plaintiff] fails to show coverage under any provision of the policy.").[6]

---

[5] TCP argues that COVID-19 eliminated the use and function of its property. (D.E. No. 22 at 2–8 & 16; D.E. No. 24 at 4–10; *see also* D.E. 18-1 at 8–18). This argument, however, is inextricably linked to the contention that Stay-at-Home Orders forced TCP to close its stores to combat the *spread* of the Virus. In *Port Authority of New York & New Jersey v. Affiliated FM Insurance Company*, the Third Circuit expressly stated that "[p]hysical damage to a building as an entity by sources unnoticeable to the naked eye must meet a higher threshold." 311 F.3d 226, 235 (3d Cir. 2002). Thus, in *Port Authority*, the court held that the "mere presence of asbestos, or the general threat of future damage from that presence, lack[ed] the distinct and demonstrable character necessary for first-party insurance coverage." *Id.* at 236. Here, there is no allegation that TCP shut its doors due to high concentrations of the Virus on its premises; rather, TCP merely complied with government orders to prevent the Virus from spreading further throughout the general population.

[6] *See ATCM Optical, Inc. v. Twin City Fire Ins. Co.*, 513 F. Supp. 3d 513, 519–23 (E.D. Pa. 2021); *Rococo Steak, LLC v. Aspen Specialty Ins. Co.*, 515 F. Supp. 3d 1218, 1222–24 (M.D. Fla. 2021); *Infinity Exhibits, Inc. v. Certain Underwriters at Lloyd's London Known as Syndicate PEM 4000*, 489 F. Supp. 3d 1303, 1307–09 (M.D. Fla. 2020); *10E, LLC v. Travelers Indem. Co. of Conn.*, 483 F. Supp. 3d 828, 836 (C.D. Cal. 2020); *Diesel Barbershop v. State Farm Lloyds*, 479 F. Supp. 3d 353, 360 (W.D. Tex. 2020); *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, 499 F. Supp. 3d 95, 98–100 (E.D. Pa. 2020); *Hillcrest Optical, Inc. v. Cont'l Cas. Co.*, 497 F. Supp. 3d 1203, 1209–12 (S.D. Ala. 2020); *Henry's Louisiana Grill, Inc. v. Allied Ins. Co. of Am.*, 495 F. Supp. 3d 1289, 1293–94 (N.D. Ga. 2020); *see also OTG Mgmt. PHL LLC v. Emps. Ins. Co. of Wausau*, No. 21-1240, 2021 WL 3783261, at *7 (D.N.J. Aug. 26, 2021); *Boscov's Dep't Store, Inc., v. Am. Guarantee & Liab. Ins. Co.*, No. 20-03672, 2021 WL 2681591, at *6 (E.D. Pa. June 30, 2021); *Arash Emami, M.D., P.C., v. CNA & Transportation Ins. Co.*, No. 20-18792, 2021 WL 1137997, at *2 (D.N.J. Mar. 11, 2021); *Café Plaza de Mesilla, Inc. v. Cont'l Cas. Co.*, No. 20-354, 2021 WL 601880, at *5–7 (D.N.M. Feb. 16, 2021); *Malaube, LLC v. Greenwich Ins. Co.*, No. 20-22615, 2020 WL 5051581, at *8 (S.D. Fla. Aug. 26, 2020).

In addition, although TCP initially stated that it does not ask the Court to conclude COVID-19 was present at its property, TCP's ultimate position requires the Court to presume that the Virus causing COVID-19 existed at its Covered Property. (*Compare* D.E. No. 18-1 at 1 n.2 (stating, in its moving brief, that TCP does not ask the Court to conclude that COVID-19 was present at its property (or the property of others), *with* D.E. No. 22 at 8–11 (arguing, in opposition to Zurich's motion, that "the presence of COVID-19 at [TCP's] locations eliminated the use of that property") *and* D.E. No. 24 at 9 (stating, in reply in support of TCP's motion, that "the [C]omplaint includes allegations that COVID-19 is present on all of its property and, therefore, coverage is triggered under the Policy")). But there are no allegations to that effect. TCP fails to allege that any employees, contractors, or customers who entered its stores tested positive for COVID-19. (*See* Compl.). Other than mere conclusory allegations, TCP does not provide any evidence to support its contention that the Virus or COVID-19 existed at its stores and in the surrounding areas. (*See id.*). In any event, the mere "presence of the [V]irus itself, or of individuals infected [with] the [V]irus, at Plaintiff's business premises or elsewhere do not constitute direct physical losses of or damage to property." *See Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, 491 F. Supp. 3d 738, 740 (S.D. Cal. 2020). While the Virus poses health concerns, it does not alter physical objects. Thus, even if TCP adequately alleged the presence of COVID-19 and the Virus at TCP's Insured Locations and surrounding areas, neither COVID-19 nor the Virus can form the basis of a claim for physical loss or damage under the Policy. *See, e.g.*, *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, No. 20-665, 2021 WL 972878, at *8 (W.D. Tex. Jan. 21, 2021) (finding that COVID-19 does not constitute physical loss or damage to property "because the [V]irus can be eliminated" and "does not threaten the structures covered by property insurance policies"); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp 3d 878, 882 (S.D.W. Va. 2020) ("The novel coronavirus

11

has no effect on the physical premises of a business.").[7]

TCP also alleges that Stay-at-Home Orders caused "direct physical loss of and/or damage to [TCP's] property." (Compl. ¶ 68; *see id.* ¶¶ 75, 83; *see also* D.E. No. 22 at 11–15). Relevant here, TCP maintains that all its stores across the United States, Canada, and Puerto Rico were closed completely in response to various Stay-at-Home Orders. (Compl. ¶ 65). Critically, however, the Complaint references Stay-at-Home Orders implemented by government officials in only three locations—New York City, Los Angeles, and New Jersey. (*Id.* ¶¶ 59–61). Because TCP (i) failed to allege the exact locations of its stores within the United States, Canada, and Puerto Rico, and (ii) only referenced three Stay-at-Home Orders in the Complaint covering specific territory, the Court will not presume that similar orders existed in every city, state, province, or country where TCP operates its stores. TCP acknowledges that *any applicable* governmental Stay-at-Home Order forced non-essential businesses to close in order to combat the spread of the Virus. (*Id.* ¶ 57). Thus, the Stay-at-Home Orders are a result of the Virus and COVID-19 rather than physical loss of or damage to TCP's Covered Property. For these reasons, the Stay-at-Home Orders do not advance TCP's position. *See, e.g.*, *Mac Prop. Grp. LLC v. Selective Fire & Cas. Ins. Co.*, No. L-2629-20, 2020 WL 7422374, at *8–9 (N.J. Super. Ct. Nov. 5, 2020) ("Since the [V]irus is alleged to be the cause of the governmental action, and the governmental action is asserted to be the cause of the loss, plaintiff cannot avoid the clear and unmistakable conclusion that the coronavirus was the cause of the alleged damage or loss."); *see also Colby Rest. Grp., Inc.*

---

[7] In addition, although the transmissibility of the Virus and health concerns that stem from the COVID-19 pandemic are widely recognized, the Court declines to conclude that the Virus necessarily existed on or around TCP's Covered Property. While TCP urges the Court to permit discovery so it may present evidence that COVID-19 existed at its stores (*see e.g.*, D.E. No. 22 at 11 n.8), the Court notes that it denied a request to stay discovery in October 2020 (D.E. No. 16), and discovery has been in progress while the instant motions were pending. (D.E. Nos. 25 & 30). In any event, allowing TCP to amend its Complaint would be futile in light of the Court's conclusion that the presence of COVID-19 and the Virus at TCP's Covered Property cannot form the basis of a claim for physical loss or damage under the Policy.

*v. Utica Nat'l Ins. Grp.*, No. 20-5927, 2021 WL 1137994, at *5 (D.N.J. Mar. 12, 2021) (collecting cases); *Eye Care Ctr. of N.J., PA v. Twin City Fire Ins. Co.*, No. 20-5743, 2021 WL 457890, at *2 (D.N.J. Feb. 8, 2021) ("But for the 'spread' of COVID-19, governments would not have issued closure orders, and Eye Care would not have stopped performing non-emergency procedures."); *Boscov's Dep't Store*, 2021 WL 2681591, at *7.

### B.     Special Coverages

Likewise, TCP's position regarding the Policy's Special Coverages is without merit. TCP alleges that certain Special Coverages provisions warrant coverage due to "the physical loss of and/or damage caused by COVID-19 at property *away* from [TCP's] locations." (Compl. ¶ 89 (emphasis added); *see id.* ¶¶ 90–104). TCP's arguments fail because it does not allege physical loss of or damage to any specific third-party property covered under the Policy. Moreover, for reasons already stated, even assuming COVID-19 or the Virus existed on non-TCP property, neither constitute physical loss or damage to third-party property. (*See supra* Section III.A). The Court addresses each particular provision in turn.

First, the Policy's Civil or Military Authority provision provides coverage for "loss . . . resulting from the necessary **Suspension** of [TCP's] business activities . . . if the **Suspension** is caused by order of civil or military authority that prohibits access to the **Location**." (P. at 36). Moreover, the order "must result from a civil authority's response to *direct physical loss of or damage* . . . to property not owned, occupied, leased or rented by [TCP] . . . and located within the distance of [TCP's] Location as stated in the [Policy's] Declarations." (P. at 36–37) (emphasis added). Here, TCP does not claim that the Stay-At-Home Orders issued in response to direct physical loss of or damage to any specific non-TCP property. (*See* Compl.). TCP's conclusory allegation that COVID-19 caused "direct physical loss of and/or damage to property belonging to

13

others" (*id.* ¶ 92) is insufficient. *See Kahn v. Pa. Nat'l Mut. Cas. Ins. Co.*, No. 20-781, 2021 WL 422607, at *8 (M.D. Pa. Feb. 8, 2021) ("[A] plain reading of the Civil Authority coverage provision unambiguously requires an allegation that another property, besides the insured premises, suffered some 'physical loss' or 'damage.'").

Next, the Contingent Time Element provision provides coverage for "loss . . . resulting from the necessary **Suspension** of [TCP's] business activities at an Insured Location if the **Suspension** results from the *direct physical loss of or damage* . . . to Property . . . at **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations**, and **Attraction Properties** located worldwide except [various countries] . . . ." (P. at 37–38) (emphasis added). As previously stated, TCP did not suspend business activities in response to physical loss of or damage to its properties or any other property, including those that fall under Direct Dependent Time Element Locations ("DDTELs"), Indirect Dependent Time Element Locations ("IDTELs"), or Attraction Properties ("APs"). (*See supra* Section III.A; *see also supra* Section I (defining DDTELs, IDTELs and APs); P. at 65 & 67–68 (defining the same)). TCP's mere recitation of the third-party property covered under DDTELs, IDTELs, and APs, without more, does not establish that such locations had physical loss or damage of any sort to trigger coverage under the Policy. (*See* Compl. ¶¶ 95–100).

Lastly, the Policy's Ingress/Egress provision covers "loss . . . resulting from the necessary **Suspension** of [TCP's] business activities at an Insured Location if ingress or egress to that Insured Location by [TCP's] suppliers, customers or employees is prevented by physical obstruction due to *direct physical loss of or damage* . . . to property not owned, occupied, leased or rented by [TCP] . . . ." (P. at 41) (emphasis added). Again, TCP's Complaint falls short because it fails to allege that TCP's suppliers, customers, or employees could not enter or leave its stores in light of a

14

physical obstruction on third-party property. (*See* Compl.). Indeed, although TCP claims that "direct physical loss of and/or damage to non-[TCP] property created a physical obstruction" (*id.* ¶ 103), the pleading contains no indication as to the type of physical obstruction or how it occurred. (*See id.*); *see also Rye Ridge Corp. v. Cincinnati Ins. Co.*, No. 20-7132, 2021 WL 1600475, at *4 (S.D.N.Y. Apr. 23, 2021) (finding no plausible claim for coverage under an ingress/egress provision where the complaint did not "allege facts showing a physical loss as required by the [p]olicies").

Accordingly, because TCP's claims hinge on whether it is entitled to coverage under the Policy, and because the Court concludes that coverage is not warranted under the Policy's unambiguous terms, Zurich is entitled to judgment on the pleadings. The Court need not consider, as Zurich urges, whether the Contamination Exclusion applies to bar coverage for TCP's claims. *See Michael Cetta, Inc. v. Admiral Indem. Co.*, 506 F. Supp. 3d 168, 185 n.5 (S.D.N.Y. 2020), *appeal withdrawn*, No. 21-0057, 2021 WL 1408305 (2d Cir. Mar. 23, 2021) (stating that "exclusions only apply if entitlement to coverage . . . is first established. Because . . . [plaintiff] fails to establish entitlement to coverage under the [p]olicy, [the court] need not reach the question of whether these various exclusions would apply"). Indeed, other courts faced with similar contamination exclusions in policies issued by Zurich have declined to address such exclusions for the same reason. *Spottswood Companies*, 2021 WL 2515255, at *6 n.8 (holding that because plaintiff "has not met its initial burden of proving that a claim against it is covered by the insurance policy . . . . [t]he court need not consider whether" an applicable exclusion applies (internal citations and quotations omitted)); *First Watch Rests.*, 2021 WL 390945, at *4 ("Since [plaintiff] cannot show coverage under [the Time Element or Special Coverages] provision[s], the [c]ourt does not address whether the contamination exclusion, or any exclusion, is applicable.").

IV.     **CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendant's motion for judgment on the pleadings and DENIES Plaintiff's motion for partial judgment on the pleadings. The Complaint is DISMISSED *with prejudice*.[8] An appropriate Order accompanies this Opinion.

Dated: September 17, 2021                                    /s/ *Esther Salas*
                                                                                    **Esther Salas, U.S.D.J.**

---

[8] Although TCP asks permission to proceed to discovery (*see, e.g.*, D.E. No. 22 at 11 n.8), it does not address whether dismissal *with prejudice* would be inequitable or if amendment would be futile. (*See generally* D.E. Nos. 18-1, 22 & 24). Indeed, TCP has not submitted a proposed amended complaint and failed to provide further support for how discovery or "an amended pleading would cure the defects in [the] original [C]omplaint." *See King ex rel. Cephalon Inc. v. Baldino*, 409 F. App'x 535, 539 (3d Cir. 2010) (upholding dismissal of the complaint *with prejudice* where plaintiff requested leave to amend "only in one sentence . . . of his response to defendants' motion for judgment on the pleadings" and failed to submit a "proposed amended complaint or explain[]" how he could cure the noted defects). Regardless, as stated above, because COVID-19 cannot form the basis of physical loss of or damage to TCP's property, the Court's dismissal is *with prejudice*. *See Andela v. Am. Ass'n For Cancer Rsch.*, 389 F. App'x 137, 142 (3d Cir. 2010) (finding dismissal of defendant's motion for judgment on the pleadings *with prejudice* appropriate where "amendment would be futile" and plaintiff "nowhere indicated in his various pleadings, including his motion for summary judgment and motion for reconsideration, that he could provide additional factual support for the [federal] claims"); (*see also supra* n.7).